UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x
ATLANTIC SPECIALTY INSURANCE COMPANY,

                         Plaintiff,

           -against-

COASTAL ENVIRONMENTAL GROUP and
STERLING EQUIPMENT, INC.,

                        Defendants.
--------------------------------------------------------------------x
STERLING EQUIPMENT, INC.,

                        Third-Party Plaintiff,

           -against-

GLOBAL INDEMNITY INSURANCE
AGENCY, INC.,

                        Third-Party Defendant.
--------------------------------------------------------------------x
GLOBAL INDEMNITY INSURANCE
AGENCY, INC.,

                        Third-Party Plaintiff,

           -against-

ALL RISKS, LTD.,

                        Third-Party Defendant.
--------------------------------------------------------------------x

**FINDINGS OF FACT
<u>AND CONCLUSIONS OF LAW</u>**

CV 14-7403 (JMA) (GRB)

APPEARANCES

James W. Carbin, Esq.
P. Ryan McElduff, Esq.
Duane Morris LLP
One Riverfront Plaza
1037 Raymond Boulevard, Suite 1800
Newark, NJ 07102-5429
      *Attorneys for Plaintiff*

Wayne D. Meehan, Esq.
Don P. Murnane Jr., Esq.
Michael E. Unger, Esq.
Eric J. Matheson, Esq.
Freehill Hogan & Mahar, LLP
80 Pine Street
New York, NY 10005-1759
     *Attorneys for Defendant Coastal Environmental Group*

Christopher M. Schierloh, Esq.
Gregory G. Barnett, Esq.
Casey & Barnett, LLC
30565 West 36th Street, 9th Floor
New York, NY 10018
     *Attorneys for Defendant Sterling Equipment, Inc.*

**AZRACK**, United States District Judge:

Plaintiff Atlantic Specialty Insurance Company ("Atlantic") brought this action against defendants Coastal Environmental Group ("Coastal") and Sterling Equipment, Inc. ("Sterling") for a declaratory judgment, seeking a declaration that a certain policy of insurance that it issued to Coastal is void *ab initio* or, alternatively, that there is no coverage. Docket Entry 5. Coastal and Sterling asserted counterclaims against Atlantic and cross-claims against each other. Docket Entries 14, 16, 25. Sterling also asserted a third-party claim against Global Indemnity Insurance Agency, Inc. ("Global"). Docket Entry 16. Global, in turn, asserted a third-party claim against All Risks, Ltd. ("All Risks"). Docket Entry 26.

The late Senior United States District Judge Leonard D. Wexler conducted a bench trial between October 30, 2017 and November 6, 2017, limited to determining whether Atlantic properly denied coverage to Coastal and Sterling, and, if not, what damages are owed by Atlantic. Judge Wexler postponed determination of (1) damages, if any, Coastal may owe Atlantic if the Court determines that Atlantic properly denied coverage; (2) Coastal's and Sterling's cross-claims; and (3) Sterling's and Global's third-party claims. Upon Judge Wexler's

death following trial, the action was reassigned to me.  The parties have chosen not to recall any witnesses.  *See* FRCP 63.  Based on a review of the record and the post-trial submissions, the Court makes the following findings of fact and conclusions of law.[1]

## I.  <u>FINDINGS OF FACT</u>

### A.  <u>The Parties</u>

1. Atlantic is a legal entity organized and existing under the laws of the State of New York with an office and principal place of business in Minnesota.  Stip. Facts ¶ 2.

2. Coastal is a legal entity organized and existing under the laws of the State of New York with an office and principal place of business in New York.  Stip. Facts ¶ 3.

3. Sterling is a legal entity organized and existing under the laws of the Commonwealth of Massachusetts with a place of business in New York.  Stip. Facts ¶ 4.

4. All Risks is a licensed insurance broker.  Stip. Facts ¶ 5.

5. Global is a licensed insurance broker and was the producing/retail insurance broker.  Stip. Facts ¶ 6.

### B.  <u>The Steeplechase Pier</u>

6. The Steeplechase Pier is located on the south side of Coney Island; it is owned by the City of New York ("City').  Stip. Facts ¶¶ 7, 9.

7. The Steeplechase Pier was damaged during Superstorm Sandy in October 2012.   Stip. Facts ¶ 8; Tr. 88-89.

8. The City hired Triton Structural Concrete ("Triton") to repair the damage to the Steeplechase Pier.  Stip. Facts ¶ 10.

---

[1]Citations are to the trial transcript ("Tr."); Deposition of Claudio Crivici ("Crivici Tr."); Atlantic's Exhibits ("Pl. Ex."); Coastal's Exhibits ("Coastal Ex."); Sterling's Exhibits ("Sterling Ex."); and Stipulated Facts, Docket Entry 145  ("Stip. Facts").

9.  Triton subcontracted Coastal to perform the repairs to the Steeplechase Pier.  Stip. Facts ¶ 11; Tr. 120; Pl.'s Ex. 34.

**C.  <u>The Charter of the MIKE B</u>**

10. Coastal's work required use of a crane and a barge capable of serving as a work platform for the crane and other equipment. Tr. 89.

11. Coastal requested a spud barge from Sterling to perform the repairs.  Tr. 865-66.

12. Sterling is in the business of leasing equipment, including barges, to companies engaged in marine constructions projects.  Tr. 749-51.

13. Sterling selected the MIKE B, a spud barge, for Coastal.  Tr. 865-66; Stip. Facts ¶ 13.

14. The MIKE B was constructed in 1967, and purchased by Sterling in 1995.  Tr. 171, 776-77.

15. A spud barge uses two spuds located on the starboard side, forward and aft, to hold the vessel in position, in this case near a work site, so that a crane can be used from the deck of the barge.  The barge is secured by lowering the spuds into the sea floor to prevent the barge from moving horizontally.  Tr. 687-88, 867, 869; Crivici Tr. 13-14.

16. Coastal chartered the MIKE B from Sterling as part of its work on the Steeplechase Pier, entering a Charter Agreement, dated March 28, 2013, covering the period April 7, 2013 to June 6, 2013.  Stip. Facts. ¶¶ 12, 14; Pl. Ex. 4.

**D.  <u>The Insurance Policy</u>**

17. Pursuant to the Charter Agreement, Coastal was required to obtain (1) hull insurance, insuring against damage to or loss of the vessel, naming Sterling as an additional insured; and (2) protection and indemnity ("P&I") insurance, insuring against third-party claims for property damage.  Pl. Ex. 4, at IMU 001774.

4

18. Coastal had preexisting hull insurance and P&I insurance with Atlantic for the period January 2013 to January 2014 (the "Policy").  Pl.'s Ex. 8.

19. On Monday, April 1, 2013 at 9:22 AM, Coastal's broker, George Zerlanko ("Zerlanko") of Global, requested Dorothy Schmidt ("Schmidt") of broker All Risks to add the MIKE B to Coastal's pre-existing Policy for hull insurance & P&I insurance.  Pl.'s Ex. 4, 5.  Zerlanko provided Schmidt with an unsigned copy of the Charter Agreement.  Pl. Ex. 4

20. On Friday, April 5, 2013 at 2:17 PM, Schmidt from All Risks transmitted Global's request for these additional coverages along with a copy of the unsigned Charter Agreement to Mark Fairchild ("Fairchild"), an underwriter at Atlantic.  Pl. Ex. 4, 5.

21. On Friday, April 5, 2013 at 3:36 PM, 1 hour and 19 minutes after the request for coverage was transmitted, Fairchild provided a quote for adding the MIKE B to the existing Coastal policies.  That communication requested that Coastal agree to a different deductible than was requested by Zerlanko and transmitted via Schmidt.  Other than the change in deductible, the quote provided by Fairchild contained no contingencies and did not require any further information from Coastal for the requested coverage to attach.  Pl. Ex. 5.

22. Fairchild explained that although the quote was unqualified, Schmidt had advised him that "a survey was being done," and maintained that the survey "was to be part of the underwriting file."  Tr. 27.  He maintained that he needed to do it that way to accommodate the insured, enabling the insured to take possession of the vessel promptly.  Tr. 27-28.

23. On Friday, April 5, 2013 at 3:39 PM, Schmidt (All Risks) transmitted Fairchild's (Atlantic's) quote to Zerlanko (Global).  Pl. Ex. 6.  At 4:17 PM that day, Zerlanko transmitted a message to Schmidt accepting the quote with the amended deductible.  Pl. Ex. 6.  Ten minutes later, at 4:27 PM, Schmidt transmitted Coastal's acceptance to Fairchild (Atlantic), at which time the

MIKE B was bound to the Policy and Sterling released the barge to Coastal.  Tr. 45, 71, 90-91; Pl. Ex. 6; Pl. Ex. 8, at COASTAL 00028.

24. On Monday, April 8, 2013, Jason Meyerrose ("Meyerrose") of Meyerrose and Co., expert and experienced marine hull and machinery surveyors, boarded the MIKE B at the Sterling yard in Staten Island to conduct an in-water survey of the barge.  At the time of the survey, Meyerrose did not observe any water entering into the barge in the vicinity of the aft spud or any compartment.  Tr. 190, 206.

25. Upon completion of the survey, Meyerrose prepared a Preliminary Survey for Insurance Underwriting Purposes ("Preliminary Survey") that same day.  Pl. Ex. 2.

26. The MIKE B had been surveyed by Meyerrose & Co. in April 2012, following completion of a project in Cape May, New Jersey by a non-party to this action.  Pl. Ex. 48.  After that survey, repairs were made to the barge's aft spud well, which had a minor leak. Tr. 199, 777-79.

27. According to Meyerrose, the MIKE B was valued at $400,000 in April 2012 by Rick Meyerrose of Meyerrose & Co.  Tr. 173.  Meyerrose estimated the value of the MIKE B as of April 2013, as reflected in the Preliminary Survey, at $400,000.  Tr. 172-73.  Meyerrose believed that the value had not decreased between April 2012 and April 2013.  Tr. 173.

28. Meyerrose sent an electronic copy of his Preliminary Survey to Coastal employee Kristine Moorehouse ("Moorehouse") on Monday, April 8, 2013 at 12:20 PM.  In the Preliminary Survey, Meyerrose stated:  "It is the opinion of the undersigned that the hull and equipment of the subject vessel are in satisfactory condition for operation in inland waters …."  Pl. Ex. 2.  In his cover email to Moorehouse attaching the Preliminary Survey, Meyerrose inquired: "This barge will be used in protected waters at Coney Island, not on the Ocean/inlet

side????"  Pl. Ex. 7.  Moorehouse responded by email to Meyerrose on Monday, April 8, 2013 at 12:26 PM, stating: "Yes that is correct it will be in protected waters at Coney Island, not in the Ocean."  Pl. Ex. 1.

29. Meyerrose testified that he equated "protected waters" with "inland waters," Tr. 168, but he placed no such limitation on the term in the Preliminary Survey.  Meyerrose could not have relied on Moorehouse's response to his question in drafting the Preliminary Survey since Meyerrose did not ask her where the barge was going to be used until he did so in the email to her attaching the completed Preliminary Survey of April 8, 2013.  *See* Pl. Ex. 7 at ALLRISKS 000037.  Moreover, he testified that had he known that the MIKE B would be used on the ocean side of Coney Island, the only change he would have made to the Preliminary Survey would have been to revise the "Recommendations" part of the report, not his conclusion, to include having a tugboat at the site 24 hours per day.  Tr. 169.  Meyerrose explained that he would make that same recommendation for any barge, old or new.  Tr. 192.  Moreover, Meyerrose conceded at trial that an objective person reading his conclusion in the Preliminary Survey that the MIKE B was suitable for operation in inland waters would infer that he found it suitable for operation at the Steeplechase Pier, part of the lower bay of New York Harbor.  Tr. 196-98.

30. The navigational limit specified in the Policy is "[c]oastal and inland waters of the United States in and around Brooklyn, NY."  Pl. Ex. 8, at COASTAL 00021; Tr. 49.  The Steeplechase Pier is within the inland waters of the United States.  Pl. Ex. 47; *see Fulton v. Ins. Co. of N. A.*, 136 F. 182 (2d Cir. 1905).

31. On Monday, April 8, 2013 at 2:29 PM, Coastal provided Zerlanko (Global) with the Meyerrose's April 8, 2013 Preliminary Survey to be forwarded to Atlantic.  Pl. Ex. 7.  Five

minutes later, at 2:34 PM, Zerlanko provided Schmidt (All Risks) with the Preliminary Survey to be sent to Atlantic.  Pl. Ex. 7.  A little over an hour later, at 4:43 PM, Schmidt provided Fairchild (Atlantic) with the Preliminary Survey and Meyerrose's e-mail (but not Coastal/Moorehouse's response), with the annotation by Schmidt, "For your file."  Pl. Ex. 7.

32. Although Atlantic now attempts to equate "protected waters" with "inland waters," the term "protected waters" is not a term defined under the relevant law or the Policy.  Moreover, Fairchild (Atlantic) received Meyerrose's question to Moorehouse concerning whether the vessel would be used in protected waters on Monday April 8, 2013, after he had bound coverage on April 5, 2013, the Friday before.  Pl. Ex. 7, at ALLRISKS 000035-37.  Fairchild (Atlantic) never received Moorehouse's answer to Meyerrose's question—the answer was sent only to Meyerrose—and therefore Fairchild could not have relied upon it.  Tr. 259-60; Pl. Ex. 1.

**E. The Loss of the MIKE B**

33. After coming on charter, the MIKE B was towed to Construction Marine's yard and a 50-ton crane valued in excess of $2,000,000 was placed onboard.  Tr. 95, 679-80, 867.

34. On Thursday, April 11, 2013, the MIKE B, with the crane and equipment on deck, was towed to the jobsite at the Steeplechase Pier and was spudded down at the direction of Coastal employee Eric Gundersen ("Gundersen").[1]  Tr. 882-83.  Sometime in the "early to mid evening" that day, before leaving the trailer used by Coastal as a temporary office

---

[1] Coastal has moved *in limine* to exclude evidence concerning Gundersen's prior arrests and convictions. Gundersen was arrested in 1994, indicted on multiple charges including attempted murder and assault, and ultimately pled guilty to felony assault in the first degree in 1998.  In 2002, Gundersen was arrested again and, in 2003, he pled guilty to attempted assault in the third degree.  The Court excludes these convictions.  Moreover, even if this convictions were admitted into evidence, they would not alter the Court's reliance on Gundersen's testimony or the Court's view of the credibility of his testimony.

facility a short distance from the pier, Gundersen checked the weather forecast which called for one-foot seas and some rain. The forecast did not concern him. Tr. 870.

35. Gundersen returned to the jobsite at approximately 7:00 AM on Friday, April 12, 2013. He went to the pier to check the conditions. At the time, the waves were "2 to 4" feet and coming from the south (from the direction of Breezy Point). He observed the barge spuds were vertical and the barge was not in distress. He returned to the trailer. Tr. 870-71, 878-79.

36. Gundersen called Miller's Launch, a company in Staten Island with which Coastal had contracted to supply a tug to move the barge on one-hour notice, and requested that a tug be dispatched to move the barge to a pre-arranged site where it would be in calmer waters. Tr. 871, 878; Coastal Ex. AR.

37. Sometime later that morning, Gundersen returned to the pier and noticed the waves were "getting quite a bit bigger." After not receiving word as to when the tug would arrive, Gundersen again called Miller's Launch to determine the status of the tug. At that time, he observed that the waves were "increasing in size" and the "ocean was getting violent." Tr. 872-73.

38. Gundersen thereafter boarded the barge and secured the crane and other equipment to the deck. He then returned to the trailer and again contacted Miller's Launch as to the tug's location. Tr. 874. Shortly thereafter, Gundersen returned to the pier where he observed that the aft spud had bent and that it would be difficult to pull it. Tr. 875.

39. After the Miller's Launch tug arrived in the late morning, Gundersen learned that the aft spud well had failed and water was entering the barge. He asked Glenn Miller of Miller's Launch to leave a tug on standby and to bring every pump he could find. Tr. 876.

40. Later that day, Miller's Launch deployed booms around the barge to protect against an oil spill and set out anchors attached to the barge to prevent the barge, which had already struck and damaged the pier, from doing any further damage. Tr. 92-93.

41. Between Friday, April 12, 2013 and Sunday April 14, 2013, Coastal worked around the clock to stabilize the MIKE B and prevent further damage to the pier. During this period, pumps were used to keep the barge afloat, and preparations were made for the removal of the crane from the deck of the MIKE B. Tr. 93-96.

42. The crane was removed from the MIKE B in the morning of Monday, April 15, 2013. Tr. 96. After the crane's removal, the pier remained in danger of being again struck by the barge and the decision was made to allow the MIKE B to rest on the sea floor in order to avoid causing any additional damage. Tr. 96-97. Eventually, the MIKE B was removed from the water and cut up for scrap.

**F. Atlantic's Declination of Coverage**

43. On Monday, April 15, 2013, Atlantic sent surveyor Alan Colletti ("Colletti") of Martin Ottoway to investigate the incident; Colletti represented the interests of Atlantic regarding both the hull and P&I insurance. Tr. 423, 550-51.

44. At 11:12 PM that day, Colletti sent his first report to Atlantic in which he stated that he "superficially inspected the failed spud well" and entered "two compartments and descended into each partially"; his initial repair estimate was $110,000. Pl. Ex. 19.

45. On Tuesday, April 16, 2013, Atlantic wrote to Coastal reserving its rights under the Policy based upon "receipt of the [Meyerrose] preliminary survey report." Pl. Ex. 41.

10

46. On Wednesday, April 17, 2013 at 9:10 AM, Colletti advised Atlantic that Claudio Crivici ("Crivici"), a marine surveyor appointed by Coastal, had asked to meet him on the barge. Coastal Ex. K.

47. On Wednesday, April 17, 2013 at 2:54 PM, Colletti advised Atlantic that Coastal was looking into salvage options, and that he agreed with Crivici that anchors should be used to hold the barge away from the pier.  Coastal Ex. K.

48. On Thursday, April 19, 2013, Colletti provided his "Preliminary Advice" to Mary Dwan ("Dwan"), a claims representative employed by Atlantic, in which he opined that the "aft starboard spud well failed as a result of severe and extensive wastage of the steel structure supporting the spud well."  Pl. Ex. 20, at IMU 000742.

49. Colletti estimated repair costs for the barge at $200,000, and advised Atlantic that he had only performed a "cursory inspection of the internal areas of the vessel."  Pl. Ex. 20, at IMU 000742.  The report contained no mention of the weather conditions at Steeplechase Pier on April 12, 2013.  Pl. Ex. 20.

50. On April 25, 2013, Atlantic wrote to Coastal acknowledging Coastal's claim for wreck removal expenses under the Policy and agreed to fund the removal under a reservation of rights.  Pl. Ex. 42.

51. On April 25, 2013, Atlantic executed Endorsement #1 to the Policy, adding the MIKE B effective April 5, 2013 through June 6, 2013.  Stip. Facts ¶ 15; Pl. Ex. 8, at COASTAL 00028.

52. The endorsement does not name Sterling as an additional insured, and Sterling is not named an additional insured nor identified in the Policy.  Pl. Ex. 8; Tr. 41, 518, 541-42.

53. Coastal's insurance brokers did not request that Sterling be added to the Policy, notwithstanding that the Charter Agreement required Coastal to obtain hull insurance naming Sterling as an additional insured.  Tr. 63, 518, 537, 546.  Fairchild testified that he saw the unsigned Charter Agreement before binding coverage, but explained that the standard in the industry is that the brokers review the contract to make sure that the coverage obtained meets the contract requirements.  Tr. 52-56.

54. Global issued a Certificate of Liability Insurance ("COI") to Coastal.  Coastal Ex. A.  The COI was issued without Atlantic's authority or knowledge.  Tr. 59-61, 91, 514, 517, 528-29, 783.  The COI bears a statement that it "CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER" or "ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW."  Coastal Ex. A; Tr. 539-40.  The COI was issued before Atlantic was asked to insure the MIKE B for Coastal.  Tr. 538.

55. On May 14, 2013, Atlantic's counsel, James W. Carbin, wrote to Atlantic requesting permission to advise Coastal the following:  "Further, given the evident unseaworthy state of the barge MIKE B at the time coverage was sought, an [sic] in the event a claim for the loss of the barge is submitted, [Atlantic] will not honor any claim for damage, loss or expense related to the barge on the ground of the unseaworthy condition in violation of the express and implied condition of coverage and the lack of the demonstration of a Named Peril."  Coastal Ex. P.  No document prepared before this e-mail had used the term "unseaworthy" in describing the condition of the MIKE B.

56. On May 24, 2013, Dwan (Atlantic) wrote to Coastal and declined coverage under the Policy for the MIKE B, even though no claim for the hull had yet been submitted by Coastal.  Pl. Ex. 44.  Dwan testified that she would have reviewed the claim with her manager before

sending out the declination of coverage, although she could not recall her manager at that time.  Tr. 562-63.

57. On October 17, 2013, Jonathan Spencer ("Spencer"), Coastal's marine insurance adjuster, wrote to Atlantic requesting payment of the $400,000 agreed value under the Policy on the basis that the vessel had been lost due to a peril of the sea. Spencer attached a report by Crivici to the submission in support.  Coastal Ex. Q and R.

58. On February 3, 2014, Thomas Kula, a claims manager for Atlantic, wrote to Spencer and declined to make payment under the Policy for the claim presented in his October 17, 2013 letter.  Coastal Ex. S.

59. On August 21, 2014, Spencer provided Atlantic with Coastal's claim under the P&I provisions of the Policy for damage to the pier, and Coastal's claim under the "Sue and Labor" provisions of the Policy (under which Atlantic agreed to pay for costs incurred in attempting to save the MIKE B), as well as reiterating the hull claim; these claims totaled $1,202,470.51.  Coastal Ex. AH.

60. On December 4, 2014, Atlantic wrote to Coastal, reserving its rights as to the claims made under the P&I provisions, and provided no response to the reiterated hull claim in Spencer's August 21, 2014 letter.  Pl. Ex. 45.

61. On December 19, 2014, Atlantic commenced this action.  Docket Entry 1.

## G. **The Cause of the MIKE B's Loss**

62. The MIKE B is an unclassed and uninspected vessel. As such, the MIKE B was not required to comply with an inspection schedule or certification regimen, nor was it regulated by an independent body, such as one of the classification societies, or the United States Coast

Guard.  Accordingly, no historical records of the vessel's condition over time were ever prepared in accordance with such regimes. Tr. 205, 252-53.

63. Significant evidence as to the MIKE B's seaworthiness as of April 8, 2013 is found in Meyerrose's testimony and the survey reports of Meyerrose and Co., the only qualified persons to have conducted a survey of the MIKE B before the incident.  *See* Pl. Ex. 2 and 3.

64. Meyerrose was aware of a prior leaking condition near the aft spud well in 2012 that had been repaired.  The vessel was not leaking at the time of his survey of April 8, 2013, as confirmed in the "On-Hire Survey" report Meyerrose issued on April 15, 2013 based on his inspection for the Preliminary Survey.  Tr. 174, 190; Pl. Ex. 3.

65. Meyerrose observed the structural components of the barge in the course of his April 8, 2013 survey.  He testified that he did not and would not have required any steel work to be done to the barge or any structural components of the barge to be replaced for the barge to be fit for use at the Steeplechase Pier.  Tr. 191-92.

66. As noted above, Meyerrose testified that the only change he would have made to his Preliminary Survey report if he knew the barge was to be used at the Steeplechase Pier is that he would have recommended a tugboat on-site 24 hours a day in case the weather required the barge be unspudded and removed from the jobsite.  Meyerrose confirmed that this recommendation was not based upon the condition of the MIKE B, but would have been for any barge working at the Steeplechase Pier.  Tr. 191-92.

67. Atlantic's expert and surveyor, Colletti, has limited experience with spud barges; his primary experience is in liquid carrying barges, which do not utilize spuds.  Tr. 419.  At the time of the MIKE B incident, Colletti had been a surveyor with Martin Ottoway for four to five years, and in that time had only been involved in surveying two other spud barges.  Tr. 418.

68. Colletti's three reports submitted to Atlantic, April 15, 17 and 19, 2013, never used the term "unseaworthy" in describing the barge.  Tr. 427-28.

69. Atlantic retained a metallurgist, Joe Crosson ("Crosson") of Lucius Pitkin to examine several pieces of the bottom plating of the MIKE B that were removed from the area of the spud wells after the barge had been broken up and removed from the site of the sinking.  Although Crosson apparently attended the vessel, reviewed samples of the material taken from the area of the aft spudwell bottom shell plating, and performed some measurements of the shell plating, he did not offer any opinion in this case.  Tr. 454.

70. Colletti opined that the MIKE B was unseaworthy, relying on measurements of the shell plating taken by metallurgist Crosson in his presence, which Colletti characterized as indicating that the shell plating was "very thin, very little material left."  Tr. 452-54; *see also* Tr. 454 (indicating that Colletti observed samples taken by the metallurgist, which, according to Colletti, "exhibited advanced corrosion").  Colletti, who is neither a naval architect nor a metallurgist, did not show what the degree of wastage of the shell plating actually was, and that such wastage was sufficient to render the MIKE B unseaworthy.  His testimony about Crosson's measurements was imprecise and not reliable.  *See* Tr. 452–53 ("If I recall correctly some of [Crosson's plate measurements] were less than an eighth of an in thickness . . . and others were a quarter to half an inch.").  Colletti's report of April 19, 2013, on which Atlantic relied in attempting to prove unseaworthiness, was not sufficiently based on the steel thickness, review of the mechanical effects of wind and sea conditions, or determination of the nature and extent of the damage to the vessel's

15

shell plating.  Colletti never took any complete and precise measurements himself, and had no data upon which to perform any calculation as to the effect of the wind and sea forces on the barge on April 12, 2013.  In fact, Colletti admitted he performed no calculation in connection with his opinion.  Tr. 417.  He did not make any calculation as to what force was necessary to cause the aft spud to deflect to the west or the forward spud to compress to demonstrate that it was the condition of the barge and not the external forces which led to the failure.  As a result of not performing such calculations, Colletti could not opine as to the amount of force that was necessary to tear the bottom shell plating in way of the aft spud well.  Tr. 429.

71. Sterling retained Rolando Santos ("Santos"), a marine surveyor, to provide an expert opinion as to the cause of the loss.  Santos is a member of the Society of Accredited Marine Surveyors and the Hull and Machinery Chair for that organization, and has extensive experience with spud barges.  Tr. 673-76.

72. Santos explained the mechanism of failure, the evidence left by the failure, and what that indicated regarding the condition of the barge's structure before the failure.  Based on his examination, Santos determined the sequence of events which led to the failure of the aft spud well and the sinking of the barge.  Santos concluded that the barge "suffered catastrophic failure due to heavy weather," as the aft spud well failed first in shear, followed by the forward spud well in compression.  In his opinion, the amount and nature of the damage seen indicated that the barge was structurally sound.  Tr. 679-87; Coastal Ex. AO.

73. Santos also explained that the pattern of damage in the vicinity of the forward spud showed that the forward spud well had been subject to tremendous forces in compression, that the damage could not have been pre-existing, and that such damage was caused by the barge's

16

movement in significantly bad weather conditions encountered at the Steeplechase Pier.  Tr. 692-93; Sterling Ex. CC-3.

74. Santos took into account the weather conditions directly from the U.S. governments NOA website, which he said showed gale force winds during the morning of April 12, 2013, to which the MIKE B was subjected.  Tr. 693-95.

75. Santos opined that the MIKE B was suitable for use at the Steeplechase Pier, provided that it was operated with a contingency plan that called for the spuds to be pulled up and the barge moved if bad weather was present.  Tr. 695-96.  In his opinion, the MIKE B would not have been lost if the spuds had been lifted prior to the arrival of the heavy weather on April 12, 2013.  Tr. 696.

76. Santos explained that the waste holes and corrosion in the deck plating observed on the MIKE B played no part in the failure of the aft spud well.  Tr. 719-20.  He testified that the fact that the MIKE B remained afloat from April 12 to April 15 despite the massive breach in its exterior shell indicated that the bulkheads were "reasonably watertight."  Tr. 722.

77. Coastal and Atlantic each presented an expert to opine on the wind and wave conditions at the Steeplechase Pier on the morning of April 12, 2013:  Dr. Austin Dooley ("Dr. Dooley") for Coastal, and Trevor Bevens ("Bevens") for Atlantic.  Tr. 785, 822.

78. Dr. Dooley opined that, at the time of the incident on April 12, 2013, waves were between "4 to 6 feet" in the area of the Steeplechase Pier, while Bevens opined that waves did not exceed two feet on April 11th and 12th.  Tr. 786-95, 811, 822-28; Coastal Ex. AQ.

79. In reaching his opinion of wave heights, Dr. Dooley relied upon a Stevens Institute of Technology model, verification of data from surrounding weather stations, and forecast data. Tr. 804-10; Coastal Ex. AK.  According to Dr. Dooley, the Stevens Institute Model is

specifically designed to show wave heights in a wave field for shallow water areas in and around New York.  Tr. 810-11. The model is widely used and considered not only reliable, but the best source of wave information in the specific area that it covers.  Tr. 789.

80. Dr. Dooley's opinion as to the wave heights and direction conforms with the first-hand observations of Coastal's Gundersen.  Gundersen testified that he observed the waves coming from the direction of Breezy Point in the south, and that the waves, which had been "2 to 4" feet when he first arrived at the site at 7:00 a.m. on Friday, April 12, were "getting bigger" and the ocean "violent."  Tr. 870-71, 878-81, Coastal Ex. AR.

81. In reaching his opinion of wave heights, Bevens took wind velocities and directions that had been recorded at Robbins Reef in New York harbor and JFK Airport, allocated a weight to each of them (75% to JFK and 25% to Robbins Reef), normalized the data to come up with wind speed at the Steeplechase Pier, and then extrapolated wave heights at Steeplechase Pier. Tr. 823-24.  The weight of Bevens' opinion is lessened by his inability to explain a sufficient basis for the 75/25 allocation of weight other than to attribute it to "experience."  Tr. 830-31. The Court finds Dr. Dooley's opinion more reliable and more persuasive than Bevens' opinion.

82. Coastal's expert marine surveyor, Crivici, testified at a deposition in lieu of trial testimony. He opined that the MIKE B was structurally sound and suitable for use at the Steeplechase Pier, based on his observations of the wreck and cut sections of the barge, sections that were not subject to shearing or cutting, frames, shell plating, the base of bulkheads, and where the

spud well was secured.[2]  Crivici Tr. 24-28.

83. Crivici explained that any lack of complete watertight integrity as a result of the condition of the internal bulkheads did not cause the failure of the MIKE B's spud wells and that the bulkheads afford some time to do mitigation work or get the crew off, but do not guarantee that the vessel will stay afloat indefinitely. Crivici Tr. 28-29.

84. Based on his post-incident observations of the MIKE B and Dr. Dooley's testimony regarding weather conditions, Crivici opined that the weather conditions were the proximate cause of the spud well failure, which would not have occurred had the spuds been lifted and the barge moved.  Crivici Tr. 23-26, 31-32.  Atlantic's expert Colletti agreed that if the spuds had been pulled the MIKE B would not have been damaged and would not have sunk.  Tr. 421-22.  Santos' testimony underscored that the barge suffered catastrophic failure due to heavy weather.  Tr. 679-81.  Indeed, the weather conditions at Steeplechase Pier on April 12, 2013 likely would have resulted in damage to any barge that had been left there with its spuds down.  Crivici Tr. 31; Tr. 695-96.

85. Crivici refuted Colletti's assertion that the cause of the loss was wastage, opining that waste holes did not cause the structural failure of the aft spud well.  Crivici Tr. 32-33.  Crivici, like Santos, provided a comprehensive opinion as to the failure of the aft spud well:

> The aft spud well I believe initially failed at the bottom in way of the connection between the spud well, the bottom plate and the frames, and that was caused by severe loading from the spud and that was caused by the barge moving side to side, up and down very violently and dynamically as a result of the weather.  That pounding and that dynamic action tore the bottom of the barge approximately 12 feet in length and it was clearly from a very strong dynamic force, and that was weather.

---

[2]  Atlantic seeks to strike any opinion by Crivici as to the suitability of the MIKE B for use at the Steeplechase Pier on the ground that Crivici offered that opinion for the first time in his deposition taken for trial on October 20, 2017 (10 days before trial) and that Atlantic suffered from that surprise.  Tr. 593.  The Court allows Crivici's testimony on this issue because it appears consistent with Crivici's testimony as to the cause of the loss and Coastal Ex. R., and because Atlantic had sufficient opportunity for cross-examination and has not shown any prejudice.

Crivici Tr. 33-34.  The Court finds Crivici's and Santos's opinions more reliable and more persuasive than Colletti's opinion.

**H.  The Amounts Claimed by Coastal**

86. Coastal's adjuster Spencer testified to his preparation and submission of the claim to Atlantic on Coastal's behalf for total loss of the MIKE B and for additional coverage for the salvage of the MIKE B and damage to the Steeplechase Pier.  Spencer explained that he sent Atlantic his spreadsheets, records, and invoices for services, materials, and equipment related to the barge salvage and pier damage (as well as for crane salvage, for which Coastal does not seek recovery).  *See* Coastal Ex.  AH.  Spencer testified that Coastal submitted to him all of the pdf invoices and that he reviewed and allocated them to the different claims before submitting them to Atlantic.  Tr. 606-07.

87. Spencer testified that Coastal's claim for the barge salvage was $583,011.97.  Coastal Ex. AH, at COASTAL 00095; Tr. 603, 633.  However, on cross-examination, Spencer admitted that, of this amount, $25,052.16 in "Other Costs," Coastal Ex. AH, at COASTAL00096, should not have been included in the claim.

88. Spencer testified that Coastal's claim resulting from damage to the Steeplechase Pier caused by the MIKE B was $402,470.51.  Tr. 603-04, 617-21; Coastal Ex. AH, at COASTAL00097. In this respect, Spencer described the methodology he used to compute this claim and how he arrived at the total amount, explaining that the amounts for the pier damage related to Triton back charges or holdbacks.  Tr. 617-21.

## II.  DISCUSSION AND CONCLUSIONS OF LAW

### A.  Jurisdiction

This is an Admiralty and Maritime claim within the meaning of Rule 9(h) of the Federal

Rules of Civil Procedure and within the Admiralty Jurisdiction of this Court pursuant to 28

U.S.C. § 1333.

### B.  The Parties' Claims

Atlantic seeks a declaration by the Court that the Policy is void *ab initio* or, alternatively,

that there is no coverage based on: (1) Coastal's breach of the duty of utmost good faith, under

the doctrine of *uberrimae fide*; (2) Coastal's breach of the express warranty of seaworthiness; (3)

Coastal's breach of the implied warranty of seaworthiness; and (4) Coastal's failure to prove that

a named peril caused the loss of the MIKE B.  Atlantic also maintains that Sterling is not an

insured under the Policy.  Coastal and Sterling maintain that Atlantic failed to prove its claims;

that they are entitle to coverage under the Policy; and that Atlantic exercised bad faith in denying

coverage under the Policy.

### C.  Atlantic's Challenges to Coverage

#### 1.  Duty of Good Faith

Atlantic claims that the Policy should be declared void *ab initio* because Coastal

breached its duty of utmost good faith in applying for and seeking coverage for the MIKE B.

According to Atlantic, Coastal breached its duty: (1) by failing to provide a complete and

accurate picture of the risk presented by the MIKE B and its use at the Steeplechase Pier, such

that the "risk presented to [Atlantic's] Fairchild was not the risk that existed at the time of the

loss"; and (2) by overstating the value of, and thereby overinsuring, the MIKE B.  Plaintiff

Atlantic Specialty's Post Trial Memorandum of Law ("Pl.'s Mem."), at 5-19.

"It is well-established under the doctrine of *uberrimae fidei* that the parties to a marine insurance policy must accord each other the highest degree of good faith." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 13-14 (2d Cir. 1986). "The doctrine of *uberrimae fidei* obligates the assured to volunteer information which might have a bearing on the scope of the risk assumed, and the failure to do so will allow the insurer to avoid the policy." *Contractors Realty Co. v. Ins. Co. of N. Am.*, 469 F. Supp. 1287, 1294 (S.D.N.Y. 1979). Atlantic bears the burden of proving breach of this duty. *Id.* at 1293-94.

Regarding use of the MIKE B at the Steeplechase Pier, contrary to Atlantic's contention, Coastal did not represent to Fairchild that the MIKE B would be used only on the north side of Coney Island. Fairchild never received Moorehouse's answer to Meyerrose's question to her concerning where the MIKE B would be used. Thus, Fairchild could not have relied upon it. Moreover, Meyerrose's Preliminary Survey concluded that the MIKE B is suitable for operation in "inland waters," a term that did – and reasonably should have been understood by Fairchild and Atlantic to -- encompass the area of the Steeplechase Pier.

Regarding the condition of the MIKE B, Atlantic claims that Coastal failed to disclose to Fairchild the "deteriorated" condition of the MIKE B. Pl.'s Mem. at 13. Atlantic contends that Meyerrose's April 8, 2013 Preliminary Survey indicated that the MIKE B was in "good" condition and that the April 15, 2013 On-Hire Survey, which was not provided to Atlantic, "presented a markedly different image of the MIKE B than the [Preliminary Survey]." Pl.'s Mem. at 15. Based on the evidence, Atlantic has failed to prove that, at the time of the loss of the MIKE B, Coastal failed to exercise good faith to disclose to Atlantic available information about the condition of the MIKE B in obtaining coverage under the Policy. Contrary to Atlantic's suggestion, Meyerrose's Preliminary Survey did not indicate that the MIKE B was in

22

"good" condition.  Rather, it indicated that the barge's overall condition was "fair for age and past service."  Pl. Ex. 2, at Meyer000057.  Meyerrose had not even completed his On-Hire Survey by the time of the loss of the MIKE B on April 12, 2013, which occurred only four days after the date of the Preliminary Survey.  Moreover, there is no indication that Coastal in any way delayed the On-Hire Survey or that it omitted, suppressed, or withheld other available information before the loss of the MIKE B.

Regarding the alleged overstatement of value of the MIKE B, Atlantic claims that the evidence proves that the MIKE B had a value of no more than half of the $400,000 stated in the Policy.  Pl.'s Mem. at 18.  "An insured's representations about, and/or concealment of, the true value of the object to be insured directly pertains to the subject matter of the risk, and thus 'overstating value is one of the most frequent subjects of breach of the duty of good faith.'" *Catlin (Syndicate 2003) at Lloyd's v. San Juan Towing & Marine Servs., Inc.*, 974 F. Supp. 2d 64, 78 (D.P.R. 2013) (quoting Thomas J. Schoenbaum, 2 Admiralty & Mar. Law § 19-14, at 413 n.44 (5th ed. 2011)).  The overvaluation of a vessel by the insured "is a misrepresentation of a material fact that voids the policy, and failure to disclose material information regarding the subject matter of the risk similarly vitiates the policy."  *Id.*  Atlantic points to testimony that the MIKE B was purchased for $90,000 in 1995 and insured by Sterling for $200,000 in April 2013. Tr. 777, 779.  However, it was left unclear whether the $200,000 represented the fair value of the MIKE B or an undervaluation.  Moreover, Meyerrose testified that he valued the MIKE B at $400,000 as of his survey in April 2013, explaining that this valuation was based on his company's April 2012 valuation and his determination that the value had not decreased over that one year.  Based on the record presented, the Court concludes that Atlantic failed to prove that the MIKE B was overvalued and overinsured.

Accordingly, Atlantic has failed to prove that Coastal breached its duty of good faith.

## 2. Seaworthiness of the MIKE B

Atlantic claims that Coastal breached an express warranty of seaworthiness in the Policy. Pl. Ex. 8, at COASTAL 00021. Atlantic also claims that Coastal breached the implied warranty of seaworthiness that arises under a policy of marine insurance when the insurance becomes effective. *See McAllister Lighterage Line v. Ins. Co. of N. Am.*, 244 F.2d 867, 870 (2d Cir. 1957). "Seaworthiness is the ability of a vessel adequately to perform the particular services required of her on the voyage she undertakes." *Cont'l Ins. Co. v. Lone Eagle Shipping (Liber.)*, 952 F. Supp. 2d 1046, 1065 (S.D.N.Y. 1997) (citing *McAllister Lighterage Line, Inc.,* 244 F.2d 867, 870 (2d Cir. 1957)), *aff'd*, 134 F.3d 103 (2d Cir. 1998)). The standard for seaworthiness "is not perfection but reasonableness. . . . [N]ot a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suited for her intended service." *Fed. Ins. Co. v. PGG Realty, LLC*, 538 F. Supp. 680, 693-94 (S.D.N.Y. 2008) (citations and internal quotation marks omitted), *aff'd sub nom. Fed. Ins. Co. v. Keybank Nat. Ass'n*, 340 F. App'x 5 (2d Cir. 2009). The meaning of "seaworthy" is "relative -- it varies with the vessel involved and the use for which the vessel is intended." *Id.* at 693; *Neubros Corp. v. N.W. Nat'l Ins. Co.*, 359 F. Supp. 310, 316 (E.D.N.Y. 1972). The implied warranty imposes a duty "regardless of fault, and the owner's knowledge of the alleged unseaworthy conditions is irrelevant." *Fed. Ins. Co.*, 538 F. Supp. at 693 (citing *Underwriters at Lloyd's v. Labarca,* 260 F.3d 3, 8 (1st Cir. 2001)). Atlantic and Coastal disagree as to which party, insurer Atlantic or insured Coastal, has the burden of proving seaworthiness, each urging that the other has the burden. The Court concludes that Atlantic bears the burden to prove that the MIKE B was unseaworthy when coverage attached on April 5, 2013 and when the loss occurred. *See Cont'l*

24

*Ins. Co. v. Lone Eagle Shipping (Liber.)*, 952 F. Supp. at 1067; *Fed. Ins. Co.*, 538 F. Supp. 2d at 693-94.

Based on the evidence, Atlantic has failed to prove that the MIKE B was unseaworthy at the time coverage attached on April 5, 2013 or on April 12, 2013 when the MIKE B was lost. Atlantic has speculated that there existed wastage holes in the vessel's shell plating below the static waterline prior to the spud well failure. Further, the evidence does not show that the presence of rust, corrosion, and/or scale on the deck plating and some frames as well as the wastage holes in the deck of the MIKE B made her unseaworthy. Colletti's opinion that the MIKE B's "aft starboard spud well failed as a result of severe and extensive wastage of the steel structure supporting the spud well," Pl. Ex. 20, at IMU 000742, was based upon what he described as his own "cursory inspection of the internal areas of the vessel." Atlantic did not demonstrate how the conditions shown in the photographs submitted into evidence rendered the MIKE B unseaworthy. Atlantic did not demonstrate that the bottom shell plating was degraded or wasted. Nor did Atlantic overcome defendants' evidence that this section of the hull, including the reinforced section of the hull, around the aft spud, tore due to the extraordinary forces applied to it. Even if Coastal bore the burden of proving seaworthiness, the determination of seaworthiness was supported by a preponderance of the evidence, including the credible testimony of experts Crivici and Santos.[3]

### 3. Covered Peril

As there are specific perils identified in the Policy, Coastal bears the burden of proving that the loss was due to a covered peril. *Cont'l Ins. Co. v. Lone Eagle Shipping (Liber.)*, 952 F. Supp.

---

[3] As explained earlier, the Court denies Atlantic's request to strike any opinion by Crivici as to the suitability of the MIKE B for use at the Steeplechase Pier. *See* ¶ 82 n.2 *supra*. Even if such opinions by Crivici were excluded, the Court would still find for Coastal on the seaworthiness issue in light of all of the other evidence in the record supporting Coastal's position.

at 1059-60 (citing *Nw. Mut. Life Ins. Co. v. Linard*, 498 F.2d 556, 561 (2d Cir. 1974)).  Coastal maintains that the MIKE B was lost due to a "peril of the sea."  Under the terms of the Policy, the "Perils" clause provides in pertinent part:  "Touching the Adventures and Perils which the Underwriters are contented to bear and take upon themselves, they are of the Seas . . . and of all other like Perils, Losses, and Misfortunes that have or shall come to the Hurt, Detriment or Damage of the Vessel, or any part thereof . . . ."  Pl. Ex. 8, at COASTAL 00007.  "The phrase 'peril of the sea' is a term of art in maritime insurance law.  The primary requirement for a finding of the existence of a peril of the sea is that 'damage be done by the *fortuitous* action of the sea.'"  *Cont'l Ins. Co. v. Lone Eagle Shipping (Liber.)*, 952 F. Supp. at 1060 (quoting *N.Y., New Haven & Hartford R.R. v. Gray,* 240 F.2d 460, 464 (2d Cir. 1957)) (internal quotation marks omitted).  The Second Circuit has held that the phrase covers "occasional visitations of the violence of nature, like great storms, even though these are no more than should be expected. Indeed, fortuitous actions of the sea much less violent than storms have been held to be within its intended coverage."  *Cont'l Ins. Co. v. Hersent Offshore, Inc.*, 567 F.2d 533, 535 (2d Cir. 1977). As Coastal urges, it is the fortuity of the weather, not the intensity, that must be considered. "Determining whether given weather is a peril of the sea is a fact-intensive inquiry which requires examination of the type of vessel, the location of the vessel, the expectability of the weather, as well as its severity."  *Cont'l Ins. Co. v. Lone Eagle Shipping ( Liber.),* 952 F. Supp. at 1061.

Based on the evidence, the Court concludes that Coastal has proven that the MIKE B was lost due to a "peril of the sea."  The MIKE B was brought to the Steeplechase Pier on Thursday April 11, 2013, as Coastal intended to start work the next day.  Coastal has shown that wind and sea conditions had generated waves in the vicinity of the Steeplechase Pier on the morning of

April 12, 2013 averaging 4 to 6 feet when the MIKE B was lost.  The combination of these fortuitous conditions, the location of the MIKE B, and the fact that its spuds were down, resulted in a dangerous situation.  When the crew recognized this danger and attempted to execute their inclement weather plan, that execution was not carried out successfully.  Coastal has shown that those weather conditions caused the damage to the MIKE B and ultimately her loss.  Atlantic's own expert conceded that the MIKE B would not have sunk but for the weather and the crew's failure to pull the spuds.  The fortuitous conditions of the weather, sea condition, and the spudded barge's location were the proximate cause of the spud well tearing, initial ingress of water, and the loss of the MIKE B.  Accordingly, the Court concludes that Coastal has proven that the MIKE B was lost due to fortuitous weather conditions at the Steeplechase Pier on April 12, 2013 acting upon the barge which had been placed at the pier with its spuds down and not timely removed. The loss thus constitutes a peril of the sea under the "Perils" clause of the Policy.

Coastal also claims that Gundersen's negligence in failing to heed the weather forecast and act earlier to have the MIKE B's spuds lifted is a separate basis on which to find coverage under the Policy.  In this respect, according to Coastal, the Policy includes an "ADDITIONAL PERILS (INCHAMAREE)" clause providing coverage for the negligence of masters, officers, crew and pilots.  That clause provides in relevant part:

> Subject to the conditions of this Policy, this insurance also covers loss of or damage to the Vessel directly caused by the following:
> . . .
> Negligence of Masters, Officers, Crew or Pilots;
> provided such loss or damage has not resulted from want of due diligence by the Assured, the Owners or Managers of the Vessel, or any of them. . . .

Pl. Ex. 8, at COASTAL 00007.

27

Although the Court need not reach this additional ground for coverage, Coastal has shown coverage on this basis. *See Continental Ins. Co. v. Hersent Offshore, Inc.*, 567 F.2d at 535-36. In *Hersent*, the Second Circuit found that the superintendent responsible for moving a barge—bareboat leased to Hersent—in the event of heavy weather fell within a similar Inchamaree clause. As the Second Circuit explained:

> Although . . . Hersent's superintendent in charge of the barge[] was found to have been imprudent in not altering the vessel's mooring lines to protect it better from the effects of the storm, his negligence is no bar to Hersent's recovery for a loss caused by a peril of the sea. The Inchmaree clause of Hersent's policy provides additional coverage for the negligence of masters, mariners, engineers and pilots. . . .
> . . . If he erred, this was negligence for which Hersent was covered by the Inchamaree clauase in its policy.

*Id.* Consistent with *Hersent*, Gundersen, as Coastal's marine superintendent, falls within the definition of "Masters, Officers, Crew or Pilots" under the Policy. As the bareboat charterer, Coastal chartered a barge presented by Sterling and had it surveyed by Meyerrose, who found it suitable for operations in inland waters. Coastal appointed Gundersen, who looked over the barge prior to bringing it to the Steeplechase Pier and had worked with similar barges and spudded them in similar situations in his career. Tr. 867-68, 876-77. Gundersen operated the barge, directed it be moved into position and spudded down, personally secured equipment on deck with chains, and determined where and when the barge should be moved at each stage of its use under the charter. Tr. 90, 93, 871, 874. Had Gundersen heeded the weather forecast and acted earlier to have the MIKE B's spuds lifted, the MIKE B would not have been damaged and lost. Moreover, Atlantic has not shown that the loss of the MIKE B resulted from a want of due diligence by Coastal. Thus, Coastal is entitled to coverage under the Policy under the Inchamaree clause.

Accordingly, Coastal has proven coverage based on a covered peril under the Policy.

### 4. **Sterling**

Atlantic maintains that Sterling is not an insured or loss payee under the Policy. The Court agrees. Sterling is not named as an additional insured or loss payee or even identified in the Policy. In fact, Coastal's insurance brokers did not request that Sterling be added to the Policy. To the extent that Sterling relies on the COI for the right to recover for the loss of the MIKE B under the Policy, that reliance is misplaced. The COI was issued by Global to Coastal, without Atlantic's authority or knowledge. As noted, it was issued before Atlantic was even asked to insure the MIKE B for Coastal. Moreover, "'[a] certificate of insurance is merely evidence of a contract for insurance, not conclusive proof that the contract exists, and not, in and of itself, a contract to insure.'" *See 10 Ellicott Square Ct. Corp. v. Mt. Valley Indem. Co.*, 634 F.3d 112 (2d Cir. 2010) (quoting *Horn Maint. Corp. v. Aetna Cas. & Sur. Co.*, 639 N.Y.S.2d 355, 356 (1st Dep't 1996)) (alteration in original); Tr. 539-40. Indeed, the COI confirms, in capital letters on its face, that it provides no coverage and does not alter the terms of the policies identified therein.

Sterling also maintains that Atlantic breached a duty of good faith to Sterling by not providing the insurance as required in the Charter Agreement. The Court disagrees. Any failure by Fairchild in this respect was not shown to have been in bad faith. Fairchild reasonably explained that it is the brokers' responsibility to review the contract to make sure that the coverage obtained meets the contract requirements. Coastal's insurance brokers did not make that request or confirm that coverage.[4]

---

[4] Based on the Court's determination that Sterling is not an insured or loss payee under the Policy (and that the MIKE B was seaworthy and that Coastal proved a covered peril), the Court need not address Sterling's arguments that, pursuant to the Charter Agreement, Atlantic waived the warranty of seaworthiness and that it should have issued an "all risks" policy not a "Named Perils" policy.

**D.  Coastal's Claim That Atlantic Exercised Bad Faith**

Coastal claims that Atlantic exercised bad faith in denying coverage under the Policy, maintaining that Atlantic failed to fully and fairly investigate the incident.  As the insurer, Atlantic owes a duty of good faith and fair dealing in the handling of claims to its insured.  *Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*, 10 N.Y.3d 187, 194 (2008).  Upon consideration, the Court finds that Coastal has not proven bad faith on the part of Atlantic in its deliberative process resulting in the declination of coverage.

**E.  Coastal's Damages**

Coastal seeks to recover a total of $1,202,470.51 under the Policy:  $400,000 for the hull value of the MIKE B; $400,000 for "sue and labor" for salvage of the MIKE B; and $402,470.51 for P&I coverage for damage to the Steeplechase Pier.

Regarding the hull value, the agreed value of the MIKE B stated in the Policy is $400,000, the value estimated by Meyerrose & Co.  Pl.'s Ex. 8, at COASTAL 00028.  The Courts finds that this $400,000 valuation is correct.

Regarding the barge salvage and pier damage claims, Coastal's marine damages adjuster Spencer testified to his preparation and submission of the claim made to Atlantic, explaining that he sent Atlantic spreadsheets, records, and invoices for services, materials, and equipment related to the barge salvage and pier damage (as well as for crane salvage, for which Coastal does not seek recovery).  *See* Coastal Ex.  AH.  Coastal's key damages exhibit is Coastal Ex. AH.

Atlantic argues that this exhibit and portions thereof are inadmissible.

When Coastal first sought to introduce this exhibit through Richard Silva, Atlantic objected arguing, *inter alia*, that "[m]any of these documents are not authenticated."  Tr. 103. The Court reserved decision, at that time, on the admissibility of Coastal Ex. AH.  Later, when

30

Coastal attempted to admit Coastal Ex. AH through Spencer, Atlantic objected, arguing that it "is chock full of summary sheets that do not have support and have not been authenticated." Tr. 608. The Court denied the objection and admitted the exhibit, stating, "I will give it whatever value I think it is worth. Accepted with that condition." Tr. 609.

In its post-trial brief, Atlantic argues that Coastal failed to authenticate the "invoices and charges" from "third parties." Pl.'s Mem. at 40–41. Atlantic, however, waived this argument. When Coastal sought to introduce this exhibit through Spencer, Atlantic did not object that the third-party invoices and charges were not authenticated. Rather, Atlantic argued that the "summary sheets" had not been authenticated. Thus, Atlantic waived any objection to the authenticity of the "invoices and charges" from third parties.

In any event, even absent waiver, there is sufficient evidence, given the entire record, for the Court to conclude that these documents were, in fact, invoices and charges from third parties, as Coastal purported. First, there is nothing suspicious on the face of these invoices to cast any doubt upon their authenticity (and Atlantic has not pointed the Court to anything in this regard). Rather, these invoices look exactly as one would expect in the circumstances and the documents from each particular third-party appear consistent with the other documents from that same third party. *See* Federal Rule of Evidence 901(b)(4) (stating that authenticity can be established by "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances.") Second, the MIKE B damaged the pier, which Triton had to fix—Triton then looked to Coastal to bear the costs of the repair. Those facts are powerful circumstantial evidence that Triton provided these third-party invoices to Coastal in order to substantiate Triton's holdbacks. At bottom, this is a feeble objection. The notion that these invoices were not authentic is, on this record, frankly absurd. Moreover, Atlantic—which

31

first received these invoices from Spencer in August 2014—had ample opportunity to explore these invoices during discovery if it had any legitimate questions about their authenticity.

Atlantic also argues that Coastal's spreadsheets that rely on these third-party invoices and charges are inadmissible under Federal Rule of Evidence 1006 because the underlying third-party invoices were not properly authenticated. *See, e.g.,* Coastal Ex. AH, at Coastal 000114–000121. Because the Court has already determined that the underlying third-party invoices and charges are admissible, Atlantic's challenge, under Rule 1006, to the spreadsheets that rely on the third-party invoices also fails.[5]

Atlantic's post-trial brief also vaguely asserts that plaintiff failed to "lay the necessary foundation" for the admission of the third-party invoices and charges into evidence. (Pl.'s Mem. at 41.) This objection is overruled.[6]

Regarding the barge salvage, this claim is limited to $400,000 under the Policy, which provides that the maximum recoverable amount shall not exceed the agreed value of the hull. Spencer identified the total barge salvage claim as $583,011.97. *See* Coastal Ex. AH, at COASTAL 00095; Tr. 603, 633. Coastal and Spencer concede that the $25,052.16 in "Other Costs" should not have been included in this total. Atlantic also challenges the inclusion of two additional items, a $148,352 invoice from Sea Wolf Marine (Invoice #7174), and a $14,882.68

---

[5] Additionally, as explained *infra*, Federal Rule of Evidence 1006 is inapplicable to the spreadsheets, which are original documents that were prepared as part of the claims submission to Atlantic.

[6] Atlantic never argued, either at trial or in its post-trial brief, that the third-party invoices were hearsay. In any event, even if Atlantic had raised such an objection, it would be overruled. Third-party records may be admitted under the business records exception, *see* FRE 803(6), where those records have been integrated into another business entity's records and relied on by the business entity. *United States v. Jakobetz*, 955 F.2d 786, 801 (2d Cir. 1992). In explaining Coastal Ex. AH and his determination of the claims, Spencer testified that Coastal submitted to him all of the pdf invoices, which he then reviewed and allocated to the different claims before submitting them to Atlantic. Tr. 606-07. Coastal's evidence was sufficient to show that the third-party documents were integrated into Coastal's records and relied on by Coastal. *See also* Tr. 101–02. Moreover, Atlantic does not claim to have been denied an opportunity to challenge the third-party invoices and charges.

invoice from Construction & Marine Equipment (Invoice #4548).  Atlantic offered persuasive evidence that these invoices should also be excluded from the barge salvage claim.  Tr. 378–79, 625–28  Accordingly, the Court reduces the claim for the barge salvage to $394,725.13.  Coastal has proven that all of the remaining costs for the barge salvage claim are appropriate and recoverable under policy.

This $394,725.13 total includes $182,000 in labor charges incurred by Coastal, which are itemized on spreadsheets that list information for each of the individual employees, including the cost for each employee and their "Roles and Responsibilities."  Coastal AH, at Coastal 00102–00113.  The spreadsheets also indicate whether the employees' work concerned the "barge salvage," "pier damage," or "crane salvage."  *Id.*  Atlantic objects to the admission of these spreadsheets, arguing that these are inadmissible summaries under Federal Rule of Evidence 1006 because Coastal never provided Spencer with any supporting documentation or further explanation of "what these employees did and how long they worked and what their involvement was," despite Spencer asking for this information.  Tr. 622.  Atlantic also asserts that Coastal failed to produce any of the supporting documentation to it during discovery.  Although Atlantic challenges the spreadsheets under Federal Rule of Evidence 1006, Atlantic has never argued that the spreadsheets are inadmissible hearsay.

The Court overrules Atlantic's objection.  Coastal prepared these spreadsheets as part of its claims submission to Atlantic before this litigation began.  These are original documents, not charts prepared for trial.  Accordingly, Rule 1006 is inapplicable.  *See 6 Weinstein's Federal Evidence* § 1006.08 (2018) ("[C]harts, summaries and calculations that are originals are admissible as such and do not need to qualify for the exception to the best evidence rule for summary evidence."); *U-Haul Int'l, Inc. v. Lumbermens Mut. Cas. Co.*, 576 F.3d 1040, 1046 (9th

33

Cir. 2009) (finding that Rule 1006 did not apply to the summaries at issue because "the summaries themselves constituted the business records. They were the writings at issue, not summaries of other evidence."). Atlantic did not object to the spreadsheets on the basis that they are inadmissible hearsay, either at trial or in its post-trial brief—thus, any objection on that basis is waived.[7]

Because the spreadsheets are admissible, Atlantic's arguments that Coastal failed to provide Spencer with supporting information merely go to weight. The Court, however, credits these spreadsheets and finds them sufficient to meet Coastal's burden of proof to show that $182,000 in labor costs were devoted to the barge salvage. Although Atlantic could have attempted to rebut this evidence by putting on evidence showing that the spreadsheets were inaccurate, it failed to do so.

Regarding Coastal's P&I claim for damage to the Steeplechase Pier, Spencer described the methodology used to compute this claim and how he arrived at the total amount, explaining that some of the amount included costs incurred by Triton for pier damage repair and withheld from Coastal. Tr. 617-21; *see* Tr. 231-32. Atlantic, however, argues that the pier damage claim does not fall within the P&I provisions.[8] Pl.'s Mem. at 38-40. Atlantic maintains that the P&I provisions cover specified third-party liabilities, conceding that such liability would include a

---

[7] Even if Atlantic did lodge a hearsay objection, the Court would overrule it. There is sufficient evidence that these spreadsheets qualify as business records. *See* Tr. 101–02, 606–07.

[8] In its Proposed Findings of Fact, Atlantic asserts that: (1) it was first notified of the alleged damages to the pier in August 2014; (2) it never had the opportunity to investigate the pier damage; (3) its reserved its right to decline coverage for the pier damage; and (4) it sent a request for documents about the claim to Coastal, which never responded. Pl.'s Proposed Findings of Fact ¶¶ 241–244. However, Atlantic's post-trial brief never asserts this as a basis for excluding Coastal's P&I claims. *See* Pl.'s Mem. at 38–40. Accordingly, Atlantic has waived any such arguments premised on the facts set forth above. Moreover, the Court notes that Coastal asserts that Colletti, Atlantic's agent, was aware of the damage to the pier at the time of his initial attendance the week of April 15, 2013, as evidenced by his own notes.

claim for pier damage against Coastal by the City of New York, the owner of the Steeplechase Pier. However, according to Atlantic, Coastal's claim is not based on any claim by the City against Coastal, since the City never made such a claim, and Coastal was sued for breach of contract by its commercial partner, Triton. Pl.'s Mem. at 40. According to Atlantic, the policy excludes "any liability assumed by the assured beyond that imposed by law," a provision Atlantic refers to as a "contract liability exclusion." Pl.'s Mem. at 38; Tr. 231-32. Atlantic characterizes Coastal's claim as a contractual dispute between Coastal and Triton, namely, that Coastal is not being paid money owed to it by Triton on their subcontract. Pl.'s Mem. at 39; Tr. 231-32. Atlantic's argument is without merit. Coastal seeks recovery for costs actually incurred to repair damage to the Steeplechase Pier caused by the MIKE B, and for which Coastal, undoubtedly, would have been answerable on a claim by the pier's owner—the City—had the repairs not been made. It is beside the point that certain of those costs were incurred by Triton and charged to Coastal in the form of holdbacks Tr. 135-36 (testimony of Richard Silva, Coastal's President). Given all of the circumstances of this case, it is clear that Coastal's liability for the pier damage was not merely contractual in nature. The Court concludes that the pier damage claim was covered and was substantiated at $402,470.51.

Atlantic also attacks the methodology relied on by Spencer to calculate the claims related to the pier damage. Spencer, an "average adjuster," who had handled thousands of claims, was offered by Coastal as an expert on "average adjustments in the handling of marine claims in the language of insurance policies." (Tr. 599, 601.) He was also a fact witness who adjusted Coastal's claims in this case and submitted them to Atlantic. (Tr. 601.) Spencer testified that the methodology for the pier damage claims was "consistent with customary change practices" and was "defensible." (Tr. 618, 620.) Spencer's testimony on this point was sufficient to satisfy

35

Coastal's burden of proof on this issue.  Notably, Atlantic did not offer any contrary proof or alternative damages calculation and, instead, has simply attempted to poke holes in Coastal's damages calculations.

Accordingly, Coastal is entitle to recover from Atlantic $400,000 for the hull value; $394,725.13 for the barge salvage; and $402,470.51 for the pier damage.

### III.  CONCLUSION

For the above reasons, Defendant Coastal is entitled to judgment against Plaintiff Atlantic in the amount of $400,000 for the hull value; $394,725.13 for the barge salvage; and $402,470.51 for the pier damage.  Coastal is directed to submit a proposed judgment, by cover letter, within 14 days from the date of this decision.

**SO ORDERED.**

_____/s/_____
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE

Dated: Central Islip, New York
       September 30, 2018

36